UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 23-1047 JGB (SPx)** | Date | September 19, 2025 |
|---|---|---|---|
| Title | ***Jacqueline Palmer, et al. v. Rob Bonta, et al.*** | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:    **Order (1) DENYING Plaintiffs' Motion for Summary Judgment (Dkt. Nos. 51-52); (2) GRANTING Defendants' Motion for Summary Judgment (Dkt. No. 64); and (3) VACATING the September 22, 2025 Hearing (IN CHAMBERS)**

Before the Court are Plaintiffs Jacqueline Palmer, Heather Lewis, and Rodolfo Jaravata Hanson's (collectively, "Plaintiffs") motion for summary judgment ("PMSJ," Dkt. Nos. 51-52) and Defendants Rob Bonta, Kristina Lawson, and Loretta Melby's (collectively, "Defendants") motion for summary judgment ("DMSJ," Dkt. No. 64) (collectively, "Motions") pursuant to Federal Rule of Civil Procedure 56 ("Rule 56"). The Court finds these matters appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering the papers filed in support of and in opposition to the Motions, the Court **DENIES** the PMSJ and **GRANTS** the DMSJ. The September 22, 2025 hearing is **VACATED**.

## I. BACKGROUND

On June 6, 2023, Plaintiffs filed a complaint for declaratory and injunctive relief against Defendants. ("Complaint," Dkt. No. 1.) The Complaint alleges that California Business and Professions Code § 2054(a) ("Section 2054"), on its face and as enforced, violates Plaintiffs' First Amendment right to freedom of speech pursuant to 42 U.S.C. § 1983. (Id.)

On August 2, 2023, Defendants filed a motion to dismiss. ("MTD," Dkt. No. 19.) On September 15, 2023, the Court granted-in-part and denied-in-part the MTD. ("Order," Dkt. No. 35.) Plaintiffs filed a first amended complaint on September 25, 2023, alleging the same

cause of action against the same Defendants.  ("FAC," Dkt. No. 36.)  On October 13, 2023, Defendants answered the FAC.  ("Answer," Dkt. No. 37.)

On March 10, 2025, Plaintiffs filed a motion for summary judgment.  (PMSJ.)  In support of their PMSJ, Plaintiffs filed the following documents:

- Statement of Undisputed Facts ("Pl. SUF," Dkt. No. 53);
- Declaration of attorney Donna G. Matias ("Matias Decl.," Dkt. No. 52-1) with attached exhibits;
- Declaration of Plaintiff Jacqueline Palmer ("Palmer Decl.," Dkt. No. 52-2) with attached exhibits;
- Declaration of Plaintiff Heather Lewis ("Lewis Decl.," Dkt. No. 52-3) with an attached exhibit; and
- Declaration of Plaintiff Rodolfo Jaravata Hanson ("Hanson Decl.," Dkt. No. 52-4) with attached exhibits.

On March 24, 2025, Defendants filed a joint motion for summary judgment and opposition to the PMSJ.  (DMSJ.)  In support of their DMSJ, Defendants filed the following documents:

- Statement of Undisputed Facts and Response to Plaintiff's SUF ("Def. SUF," Dkt. No. 64-1);
- Declaration of attorney Shiwon Choe ("Choe Decl.," Dkt. No. 64-2) with attached exhibits; and
- Declaration of Sharlene Smith, Chief of Enforcement at the Medical Board of California ("MBC") ("Smith Decl.," Dkt. No. 64-3).

On March 31, 2025, Plaintiffs filed a joint opposition to the DMSJ and reply in support of the PMSJ.  ("PMSJ Reply," Dkt. No. 67.)  In support of their PMSJ Reply, Plaintiffs filed the following documents:

- Response to Defendants' SUF ("Pl. Supp. SUF," Dkt. No. 68); and
- Supplemental Declaration of attorney Donna G. Matias ("Matias Supp. Decl.," Dkt. No. 67-1) with attached exhibits.

On April 7, 2025, Defendants filed a reply in support of the DMSJ.  ("DMSJ Reply," Dkt. No. 77.)  In support of their DMSJ Reply, Defendants filed a supplemental declaration of attorney Shiwon Choe ("Choe Supp. Decl.," Dkt. No. 77-1) with attached exhibits.

Between March and May 2025, various professional associations requested leave to file amici briefs in support of the PMSJ and DMSJ (Dkt. Nos. 55, 57, 66, 71), which the Court granted (Dkt. Nos. 62, 65, 83, 85).  The following professional associations submitted amici briefs in support of the PMSJ:

- American Association of Nurse Practitioners ("AANP Brief," Dkt. No. 63);
- The American Association of Nurse Attorneys ("TAANA Brief," Dkt. No. 75); and
- California Association of Nurse Anesthesiology ("CANA Brief," Dkt. No. 84).

The California Medical Association ("CMA") and the American Medical Association ("AMA") (collectively, "Medical Associations") submitted an amicus brief in support of the DMSJ. ("Medical Associations Brief," Dkt. No. 86.)

## II. FACTS

### A. Evidentiary Objections

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment." Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002); see Fed. R. Civ. P. 56(e). For summary judgment, courts consider evidence with **content** that would be admissible at trial, even if the ***form*** of the evidence would not be admissible at trial. See, e.g., Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003). The Court considers the parties' objections only where necessary.[1] All other objections are **OVERRULED AS MOOT**.

### B. Undisputed Facts

The following material facts are sufficiently supported by admissible evidence and are uncontroverted, except as noted. They are "admitted to exist without controversy" for purposes of the Motions. See Fed. R. Civ. P. 56(e)(2); L.R. 56-3.

### 1. Section 2054

Section 2054 provides, in relevant part:

> [a]ny person who uses in any sign, business card, or letterhead, or, in an advertisement, the words "doctor" . . ., the letters or prefix "Dr.," . . . or any other terms or letters indicating or implying that the person is a physician and surgeon . . . without having at the time of so doing a valid, unrevoked, and unsuspended certificate as a physician and surgeon under this chapter, is guilty of a misdemeanor. No person shall use the words "doctor" or "physician," the letters or prefix "Dr.," . . . or any other terms or

---

[1] "[O]bjections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and are therefore "redundant" and unnecessary to consider here. Burch v. Regents of Univ. of California, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted.").

> letters indicating or implying that the person is a physician and
> surgeon . . . in a health care setting that would lead a reasonable
> patient to determine that person is a licensed "M.D." or "D.O."

Cal. Bus. & Prof. Code § 2054(a).  MBC has received inquiries from other California healthcare licensing boards regarding the application of Section 2054 to their licensees with doctoral degrees.  (Pl. SUF ¶ 3.)

California Senate Bill 1451 ("SB 1451") amended Section 2054 to (1) allow Doctors of Osteopathy to use the title "Dr." or the term "doctor" (id. ¶ 4) and (2) prohibit the unauthorized use of the title "Dr." or the term "doctor" "in a healthcare setting" (id. ¶ 5).[2] Defendant Melby indicated that the Board of Registered Nursing supported SB 1451 only if it allowed nurses with a terminal degree (i.e., Doctor of Nursing Practice) to use "Dr." "regardless of setting" so long as they indicated their profession or specialty on their badge and in communication.  (Id. ¶ 6.)

### 2. Enforcement of Section 2054

On August 25, 2022, Defendant Rob Bonta, on behalf of the Board of Registered Nursing, filed an Accusation against Sarah Anne Erny, who is a Doctor of Nursing Practice ("DNP"), for "representing to patients that she was a medical doctor" in violation of Section 2054.  (Id. ¶ 58.) MBC had previously received a complaint against Erny.  (Def SUF at 8 ¶ 59; Dkt. No. 36-1 ¶ 21.)

On October 27, 2022, the District Attorney for San Luis Obispo County, CA filed a complaint for an injunction, civil penalties, and other equitable relief against Sarah Erny, DNP. (Pl. SUF ¶ 60.)  The complaint alleged that Erny violated Section 2054 and other sections of the California Business and Professions Code that pertain to unfair business practices and false advertising.  (Id. ¶¶ 60, 62; Dkt. No. 36-2 ¶¶ 28-38.)

Erny was ordered to pay $19,750 in civil penalties.  (Pl. SUF ¶ 63.)  Of Erny's civil penalties, $16,000 went to the District Attorney's office's "Consumer Protection Trust Fund" while $3,750 went to "investigative costs."  (Id. ¶ 64.)  Erny was also ordered to "[c]onduct electronic searches of 'Sarah Erny' to determine if any third-party medical provider digital platform [was] advertising or listing [Erny] as 'Doctor' or [] by the prefix 'Dr.' and to make diligent efforts to remove these references."  (Def. SUF at 9 ¶ 65; Dkt. No. 36-3 ¶ 4.)
//
//

---

[2] Defendants dispute these facts, arguing that they are instead "legal arguments [or] conclusions."  (See Def. SUF at 1 ¶¶ 4-5 (citing "Standing Order," Dkt. No. 13 at 6).) However, "legislative history . . ., is admissible [evidence at summary judgment] under the public records exception to the hearsay rule."  See Sobel v. Hertz Corp., 291 F.R.D. 525, 533 (D. Nev. 2013), aff'd in part, vacated in part on other grounds, 674 F. App'x 663 (9th Cir. 2017) (citing Fed. R. Evid. 803(8)).

On January 4, 2023, MBC issued a citation for $2,500 to Sarah Erny for "using the prefix
'Dr.'" in violation of Section 2054. (Pl. SUF ¶ 66.)  The citation also ordered Erny to
"immediately cease and desist use of the initials 'Dr.'"  (Id. ¶ 67.)

### 3. Plaintiff Jacqueline Palmer

Plaintiff Jacqueline Palmer holds a DNP from Chamberlin University. (Id. ¶ 7.)  Palmer is
currently licensed by the California Board of Registered Nursing.  (Id. ¶ 8.)  Palmer began her
nursing career in 2003 as a Licensed Vocational Nurse ("LVN").  (Id. ¶ 9.)  Palmer earned her
bachelor's degree in nursing in 2010.  (Id. ¶ 10.)  Palmer has earned master's degrees in the
following subjects: Family Nursing Practice; Nursing Leadership; and Psychiatric Nurse
Practitioner.  (Id. ¶ 11.)  Palmer is not a medical doctor.  (Pl. Supp. SUF ¶ 1.)  Palmer has never
attended medical school.  (Id. ¶ 4.)  Palmer does not meet the requirements to be licensed as a
physician in the State of California.  (Id. ¶ 7.)

Palmer began working as a nurse practitioner in 2018, specializing as a Family Nurse
Practitioner ("FNP").  (Pl. SUF ¶ 12.)  Palmer earned her DNP in 2020.  (Id. ¶ 13.)  Between
2020, when she earned her DNP, and 2023, Palmer (1) wore a clinician's jacket embroidered
with "Dr. J. Palmer, FNP-C" (id. ¶ 14); (2) introduced herself to patients, "I'm Dr. Jacqueline
Palmer. I'm a nurse practitioner" (id. ¶ 15); (3) signed her name on official clinic documents
using the title "Dr." and "FNP" as a post-nominal (id. ¶ 16); and (4) was not aware that it was
illegal to use the title "Dr." on her clinician's jacket or in any other way so long as she disclosed
that she was a nurse practitioner (id. ¶ 17).  Palmer has always disclosed to patients that she is a
nurse practitioner.  (Id. ¶ 18.)  Palmer has never practiced outside of her scope of practice for
licensure.  (Id. ¶ 19.)

Palmer believes that it is important for patients to know whether their healthcare provider
is a medical doctor versus a DNP.  (Pl. Supp. SUF ¶ 10.)  Palmer believes that healthcare
providers should make it as clear as possible to patients whether a given healthcare provider is or
is not a medical doctor.  (Id. ¶ 13.)  Patients have assumed that Palmer was a medical doctor.  (Id.
¶ 14.)  Palmer admits that in medical settings, "doctor" can refer to a licensed physician and
surgeon.  (Id. ¶ 16.)  Palmer agrees some people believe that the word "doctor" refers to
physicians.  (Id. ¶ 19.)  Palmer agrees that DNPs use of the title "doctor" without further
clarification of their title makes it less clear for patients to know whether they are medical doctors
or not.  (Id. ¶ 21.)  The American Medical Association's survey results that show that 39% of
patients believe that a DNP is a physician is consistent with Palmer's understanding of whether
patients think DNPs are physicians.  (Id. ¶ 22.)  Palmer believes that DNPs using the title
"doctor" in a healthcare context without clarifying that they are nurse practitioners would be
"deception."  (Id. ¶ 23.)

After learning about the legal actions against Erny, Palmer was surprised to find that using
"Dr." was illegal if she also disclosed that she was a nurse practitioner and not a physician.  (Pl.
SUF ¶ 68.)  Palmer did not want to break the law, so she immediately stopped wearing her
clinician's jacket with "Dr. J. Palmer, FNP-C."  (Id. ¶ 69.)  Palmer stopped signing official clinic

documents using the title "Dr." (Id. ¶ 70.) Palmer asked others not to refer to her as "Dr." (Id. ¶ 71.) If it were legal to do so, Palmer would return to wearing a clinician's jacket with "Dr. Palmer" followed by her credentials. (Id. ¶ 72.) If it were legal to do so, Palmer would also use the title "Dr." in a healthcare setting while disclosing that she is a nurse practitioner and not a physician. (Id. ¶ 20.) Palmer plans to continue to tell patients that she is a nurse practitioner whether it is legal to use the title "Dr." (Id. ¶ 73.)

### 4. Plaintiff Heather Lewis

Plaintiff Heather Lewis holds a DNP from Aspen University, which she earned in March 2023. (Id. ¶ 21.) Lewis is currently licensed by the California Board of Registered Nursing. (Id. ¶ 22.) Lewis began her nursing career as a LVN in 1993. (Id. ¶ 23.) Lewis earned a Master of Science in nursing education from Chamberlin University in 2014. (Id. ¶ 24.) Lewis earned a Master of Science in family nursing practice from Chamberlin University in 2016. (Id. ¶ 25.) Lewis is not a medical doctor. (Pl. Supp. SUF ¶ 2.) Lewis has never attended medical school. (Id. ¶ 5.) Lewis does not meet the requirements to be licensed as a physician in the State of California. (Id. ¶ 8.)

Lewis worked full-time as a nurse practitioner for a bariatric surgeon as well as a chiropractic clinic while studying for her DNP degree. (Pl. SUF ¶ 26.) While Lewis worked as a nurse practitioner at a bariatric surgery center, the physician for whom she worked encouraged and mentored her through her doctoral degree in nursing practice. (Id. ¶ 27.) Lewis works with two chiropractic doctors who have never indicated that they believed she was a physician or surgeon. (Id. ¶ 28.)

Lewis introduces herself as a nurse practitioner to new patients. (Id. ¶ 29.) The parties dispute whether Lewis' patients ever indicated that they believed she was a physician or surgeon. (See Lewis Decl. ¶¶ 6-7; Choe Decl., Exhibit 10 at 56:20-23.) Lewis has never practiced outside of her scope of practice for licensure. (Pl. SUF ¶ 31.) When she received her DNP, Lewis (1) had business cards and an office door sign/nameplate reading "Dr. Heather Lewis, FNP-C, DNP" (id. ¶¶ 32, 74, 78) and (2) initially referred to herself as "Dr. Heather Lewis, FNP-C, DNP" on social media (id. ¶¶ 33, 76).

Lewis believes that it is important for patients to know whether their healthcare provider is a medical doctor versus a DNP.[3] (Pl. Supp. SUF ¶ 11.) Lewis admits that in medical settings, "doctor" can refer to a licensed physician and surgeon. (Id. ¶ 17.)

---

[3] Plaintiffs contend that this fact is "[u]ndisputed with the understanding that Lewis believes it is important to know [this] about whatever healthcare provider they see." (See Pl. Supp. SUF ¶ 11.) However, the caveat Plaintiffs provide for this fact does not contradict the fact as asserted. (See Standing Order at 6 (requiring the opposing party to "cit[e] evidence supporting the dispute" and "not [to] set forth legal or evidentiary objections in the statement of genuine disputes of material facts"); see id. at 7 ("If a party fails to dispute a fact properly by offering evidence that does not contradict the proffered fact, the Court will deem the fact

After learning about the legal actions against Erny, Lewis decided not to use the business cards and office door sign/nameplate reading "Dr. Heather Lewis, FNP-C, DNP" because she feared similar action against her.[4] (Pl. SUF ¶¶ 34, 75, 79.) After the Erny case, Lewis changed her social media handle to remove "Dr." because she feared similar action against her. (Id. ¶¶ 35, 77.) If it were legal to do so, Lewis would use the title "Dr." inside and outside of a healthcare setting, while disclosing that she is a nurse practitioner and not a physician. (Id. ¶¶ 36, 80.)

### 5. Plaintiff Rodolfo Jaravata Hanson

Plaintiff Rodolfo Jaravata Hanson holds a DNP from Johns Hopkins University. (Id. ¶ 37.) Hanson is currently licensed by the California Board of Registered Nursing. (Id. ¶ 38.) Hanson emigrated from the Philippines to the United States in 2007. (Id. ¶ 39.) Hanson holds a bachelor's degree in physical therapy and a master's degree in education. (Id. ¶¶ 40-41.) Hanson also holds a bachelor's degree in nursing from Mount St. Mary's University in Los Angeles, which he obtained in 2017. (Id. ¶ 42.) Hanson is not a medical doctor. (Pl. Supp. SUF ¶ 3.) Hanson has never attended medical school. (Id. ¶ 6.) Hanson does not meet the requirements to be licensed as a physician in the State of California. (Id. ¶ 9.)

Hanson began working as an intensive care unit nurse in 2017. (Pl. SUF ¶ 43.) From January 2018 to October 2019, Hanson attended school full-time for his master's degree in family nursing practice while working full-time as a nurse. (Id. ¶¶ 44-45.) From May 2021 to May 2023, Hanson worked full-time as a nurse practitioner in neurosurgery and pre-anesthesia while attending school full-time to obtain his DNP degree. (Id. ¶¶ 46-47.)

Hanson currently works in an ambulatory pre-anesthesia clinic. (Id. ¶ 48.) Hanson's job is to ensure that pre-surgical patients are safe to receive anesthesia for procedures ordered by a surgeon or proceduralist. (Id. ¶ 49.) Hanson always introduces himself to patients by telling them that he is a nurse practitioner. (Id. ¶ 50.) Hanson does not solicit his own patients at the clinic he works at; instead, they schedule appointments through his employer. (Id. ¶ 51.) Hanson always tells patients that his role is not to provide anesthesia or surgery, but to clear the patient for anesthesia. (Id. ¶ 52.) If a patient calls Hanson "Dr.", he always ensures that they

---

undisputed . . . .").) Here, and for any facts that are not contradicted by the record, "the Court will deem the fact undisputed for purposes of the [M]otion[s]." (See Standing Order at 7; see, e.g., Pl. Supp. SUF ¶¶ 12, 14, 20, 29, 31, 33-40, 42-43, 47, 50-51, 54-55, 57.)

[4] Defendants assert that this fact is undisputed "with the understanding this refers to Lewis' opinion about Defendants, not Defendants' actual actions." (Def. SUF at 5 ¶ 34.) Here, and for any opinions that are (1) "rationally based on the witness's perception"; (2) "helpful . . . to determining a fact in issue"; and (3) "not based on . . . specialized knowledge" that is within the scope of expert witness testimony, "the Court will deem the fact undisputed for purposes of the [M]otion[s]." Fed. R. Evid. 701; (see also Standing Order at 7; see, e.g., Pl. SUF ¶¶ 55-57, 68, 75, 77, 81-82, 85; Pl. Supp. SUF ¶¶ 47, 57.)

know he is not a physician.  (Id. ¶ 53.)  Hanson has never operated outside of his scope of practice for licensure.  (Id. ¶ 54.)

Hanson believes that patients have the right to know the credentials and role of their healthcare providers and that he has an obligation to tell them about himself.  (Id. ¶ 55.)  Hanson believes that it is important for patients to know whether their healthcare provider is a medical doctor versus a DNP.  (Pl. Supp. SUF ¶ 12.)  Hanson believes that disclosing a doctorate degree signals to patients that the provider has worked to the highest stage in his or her profession.  (Pl. SUF ¶ 56.)  As a Doctorate holder, Hanson believes that he has earned the right to use the title "Dr." in and outside of a healthcare setting so long as he discloses that he is a nurse practitioner. (Id. ¶ 57.)  Hanson admits that in medical settings, "doctor" can refer to a licensed physician and surgeon.  (Pl. Supp. SUF ¶ 18.)  Hanson hypothetically agrees that if a healthcare provider introduces himself as "Dr. So-and-So" without further explanation, a patient might think the provider is a physician.  (Id. ¶ 20.)

When Hanson learned about the legal actions against Erny, he was angry and shocked because the nursing board encourages licensees to pursue a doctorate degree as a benefit to the profession.  (Pl. SUF ¶ 81.)  After learning about the legal actions against Erny, Hanson refrained from using the title "Dr." or "doctor" because he feared similar action against him.  (Id. ¶ 82.)  Hanson owns a desk nameplate that reads "Dr. Rodolfo Hanson, DNP, MSN, MASE, BSPT, RN, FNP-C, PHN" that he does not use in his workplace.  (Id. ¶ 83.)  Hanson will use the nameplate in his workplace if it is legal to do so.  (Id. ¶ 84.)  Hanson is worried that using the word "doctor" in the phrase "Doctor of Nursing Practice" in his signature block is illegal under Section 2054.  (Id. ¶ 85.)  Hanson wanted to open an esthetics clinic and in 2021 purchased a website, www.xoeyclinic.com, to that end.  (Id. ¶ 86.)  Hanson put plans for his esthetics clinic and website on hold because he wants to be able to use the title "Dr." and disclose his full credentials, but he is afraid it will run afoul of Section 2054.  (Id. ¶ 87.)  If it were legal to do so, Hanson would use the title "Dr." inside and outside of a healthcare setting, including on xoeyclinic.com, while disclosing that he is a nurse practitioner and not a physician.  (Id. ¶ 88.)

### 6.  Doctor of Nursing Practice

There is nothing that a nurse practitioner that has a DNP can do that a nurse practitioner that does not have a DNP cannot.  (Pl. Supp. SUF ¶ 24.)  Palmer became a nurse practitioner before she obtained a DNP or began her DNP program.  (Id. ¶ 25.)  Lewis became a nurse practitioner before she obtained a DNP or began her DNP program.  (Id. ¶ 26.)  Hanson became a nurse practitioner before he obtained a DNP or began his DNP program.  (Id. ¶ 27.)

Palmer's DNP program was two years long.[5]  (Id. ¶ 28.)  Lewis believes that her DNP program could be as short as 18 months long.  (Id. ¶ 29.)  The parties dispute how long it took

---

[5] Plaintiffs dispute this fact, arguing that Defendants "mischaracterizes" Palmer's testimony, but do not offer contrary evidence.  (See Standing Order at 6 (requiring the opposing party to "cit[e] evidence supporting the dispute" and "not [to] set forth legal or evidentiary

Hanson to complete his DNP program. (Id. ¶ 30; Choe Decl., Exhibit 11 at 17:2-18.) Hanson's bachelor's, master's, and DNP programs were a combined total of five to five-and-a-half years long. (Pl. Supp. SUF ¶ 33.) Some DNP programs are only one year long. (Id. ¶ 34.)

Palmer's DNP program was online with no in-person classes. (Id. ¶ 31.) Lewis' DNP program was online with no in-person classes. (Id. ¶ 32.) Hanson's DNP program was online with no in-person classes. (Id. ¶ 35.) Palmer's DNP program had no courses in anatomy, biology, biochemistry, immunology, physiology, pathology, or pharmacology. (Id. ¶ 36.) Lewis' DNP program had no courses in anatomy, biology, biochemistry, immunology, physiology, pathology, pharmacology, or differential diagnoses. (Id. ¶ 37.) Hanson's DNP program had no courses in anatomy, biology, biochemistry, immunology, physiology, pathology, pharmacology, or differential diagnoses. (Id. ¶ 38.)

Palmer's DNP program had components that addressed "healthcare from a broader system, how insurance companies play a role, [and] how businesses play a role in healthcare." (Id. ¶ 39.) Lewis' DNP program had no classes that involved patient interaction. (Id. ¶ 40.) Hanson's DNP program did not have any clinical work with patients. (Id. ¶ 41.) Palmer does not remember any admission requirements for her DNP program other than having a master's degree and writing a paper about why she wanted to be a DNP. (Id. ¶ 42.) Lewis did not recall other admission requirements for her DNP program other than having a master's degree. (Id. ¶ 43.)

### 7. Use of Titles

Palmer wants to refer to herself with the title "doctor" to patients and in business cards, letterhead, websites, and advertisements. (Id. ¶ 44.) Lewis wants to refer to herself with the title "doctor" to patients and on websites, social media, business cards, and advertisements. (Id. ¶ 45.) Hanson wants to refer to himself with the title "doctor" to patients and on business cards, work scrubs, prescription pads, websites, letterhead, advertisements, and social media. (Id. ¶ 46.) Hanson believes that he will attract more patients if he can call himself "Dr. Hanson" as opposed to not using the title "doctor," because "[i]f patients were given the opportunity to pick between two clinics, one with Dr. Hanson and one with Mr. Hanson written on it, most would gravitate to the former." (Id. ¶ 47.)

Palmer has used the title "Dr." with the letters FNP and FNP-C after her name. (Id. ¶ 48.) Lewis has used the title "Dr." with the letters FNP-C and DNP after her name. (Id. ¶ 49.) Hanson has used the title "Dr." with the letters DNP, MSN, MASE, BSPT, RN, FNP-C, and PHN after his name. (Id. ¶ 50.)

//

---

objections in the statement of genuine disputes of material facts"); see id. at 7 ("If a party fails to dispute a fact properly by offering evidence that does not contradict the proffered fact, the Court will deem the fact undisputed . . . .").) Here, and for any disputes which are unsupported by the record, "the Court will deem the fact undisputed for purposes of the [M]otion[s]." (See Standing Order at 7; see e.g., Def. SUF at 7 ¶ 58.)

Palmer has no understanding of whether patients know what the letters FNP-C mean. (Id. ¶ 51.) Palmer did not encounter the letters FNP-C or knew what they meant until after she became a nurse. (Id. ¶ 52.) Lewis did not encounter the letters FNP or FNP-C or knew what they meant until after she entered the nursing field. (Id. ¶ 53.)

Palmer has no understanding of whether patients know what the letters DNP mean. (Id. ¶ 54.) Lewis is not sure if she encountered the letters DNP or knew what they meant until after she was in her bachelor's program for nursing. (Id. ¶ 55.) Hanson did not encounter the letters DNP or knew what they meant until after he was in nursing school. (Id. ¶ 56.) Hanson believes that patients do not know what the letters DNP mean, unless he explains it to them. (Id. ¶ 57.)

Lewis did not know what the letters MSN meant before she started her nursing program. (Id. ¶ 58.) Hanson did not encounter the letters MSN or knew what they meant until after he started attending nursing school. (Id. ¶ 59.)

Palmer does not know what the letters MASE mean. (Id. ¶ 60.) Lewis does not know what the letters MASE mean. (Id. ¶ 61.) Hanson did not know what the letters MASE meant before he applied for his MASE program. (Id. ¶ 62.) Palmer does not know what the letters BSPT mean. (Id. ¶ 63.) Lewis does not know what the letters BSPT mean. (Id. ¶ 64; Choe Decl., Exhibit 10 at 42:6-7.) Hanson did not encounter the letters BSPT or knew what they meant until he started applying to be a physical therapist. (Pl. Supp. SUF ¶ 65.) Palmer does not know what the letters PHN mean. (Id. ¶ 66.) Hanson did not encounter the letters PHN or knew what they meant until after he started nursing school. (Id. ¶ 67.)

## III.  LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying the portions of the pleadings and record that it believes demonstrate the absence of an issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the nonmoving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the nonmoving party's case. Id. at 325. Instead, the moving party need only prove there is an absence of evidence to support the nonmoving party's case. Id.; In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

If the moving party has sustained its burden, the nonmoving party must then show that there is a genuine issue of material fact that must be resolved at trial. Celotex, 477 U.S. at 324. The nonmoving party must make an affirmative showing on all matters placed at issue by the motion as to which it has the burden of proof at trial. Id. at 322; Anderson, 477 U.S. at 252. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. "This burden is not a light one.

The nonmoving party must show more than the mere existence of a scintilla of evidence." <u>In re Oracle</u>, 627 F.3d at 387 (citing <u>Anderson</u>, 477 U.S. at 252).

When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the nonmoving party. <u>Barlow v. Ground</u>, 943 F.2d 1132, 1135 (9th Cir. 1991). Thus, summary judgment for the moving party is proper when a "rational trier of fact" would not be able to find for the nonmoving party based on the record taken as a whole. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

## IV. DISCUSSION

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'" <u>Reed v. Town of Gilbert, Ariz.</u>, 576 U.S. 155, 163 (2015). "Under that Clause, a government, including a municipal government vested with state authority, has no power to restrict expression because of its message, its ideas, its subject matter, or its content." <u>Id.</u> (citation modified). Content-based restrictions on speech are presumptively unconstitutional and may be justified only if the government proves that they survive strict scrutiny, that is, that they are narrowly tailored to serve compelling state interests. <u>See id.</u> at 163, 171. Content-neutral laws are subject to intermediate scrutiny. <u>See City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC</u>, 596 U.S. 61, 67 (2022). "[T]o survive intermediate scrutiny, a restriction on speech or expression must be narrowly tailored to serve a significant governmental interest." <u>Id.</u> at 76.

Plaintiffs argue that, on its face and as applied, Section 2054 unconstitutionally criminalizes their use of "Dr." or "doctor." (<u>See</u> PMSJ at 12; FAC ¶ 35.) Specifically, Plaintiffs assert that Section 2054 is a content- and speaker-based restriction on speech, and thus subject to strict scrutiny. (<u>See</u> PMSJ at 19-21.) As such, Plaintiffs contend that Section 2054 cannot withstand strict scrutiny because the law does not serve a compelling state interest and is not narrowly tailored. (<u>See id.</u> at 23-24.) Even if the Court applies the level of scrutiny associated with the regulation of commercial speech, Plaintiffs further argue that their use of "Dr." or "doctor" is not misleading, and that Section 2054 (1) does not directly advance a substantial government interest and (2) regulates more extensively than necessary.[6] (<u>See id.</u> at 24-30.)

Defendants counter that Plaintiffs' facial challenge to Section 2054 fails because the law's supposedly unconstitutional applications do not "substantially outweigh" its lawful applications.

---

[6] Plaintiffs also argue that they have standing to assert their First Amendment claim. (<u>See</u> PMSJ at 14-19.) Defendants do not address or oppose Plaintiffs' standing arguments. (<u>See</u> DMSJ.) "[A]rguments to which no response is supplied are deemed conceded." <u>Caravan Canopy Intl, Inc. v. Home Depot U.S.A. Inc.</u>, 2021 WL 831028, at *3 (C.D. Cal. Feb. 25, 2021); <u>Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.</u>, 802 F. Supp. 2d 1125, 1132 n.5 (C.D. Cal. 2011) ("[F]ailure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue."). Accordingly, the Court deems this argument conceded by Defendants.

(See DMSJ at 13-14.)  Defendants further assert that Section 2054 is a legitimate regulation of commercial speech because (1) Plaintiffs use of "Dr." or "doctor" is inherently misleading; (2) Section 2054 directly advances a substantial government interest; and (3) Section 2054 is not more extensive than necessary.  (See id. at 14-24.)  For the reasons set forth below, the Court agrees with Defendants.

## A. Facial Challenge to Section 2054

Plaintiffs argue that "[o]n its face, [S]ection 2054[] sweeps in its ambit an array of professionals who are not physicians or surgeons but who still can truthfully (and regularly) call themselves 'Dr.': psychologists (PsyD), pharmacists (PharmD), naturopaths (ND), physical therapists (DPT), and Ph.Ds (including honorary Ph.Ds)."  (See PMSJ at 8.)  Plaintiffs further assert that Section 2054 prohibits certain individuals from referring to themselves as "Dr." or "doctor"— "a hornbook example of a content-based speech restriction, because what is banned turns on the words used."  (See id. at 20.)  Moreover, Plaintiffs contend that Section 2054 is a speaker-based restriction on speech because "it restricts usage of the term 'doctor' and title 'Dr.' by all but physicians and surgeons" while "[a]ll others using the term or title—at least in the healthcare context—are subject to prosecution."  (See id. at 21.)  Defendants counter that Plaintiffs challenge Section 2054 only with respect to DNPs, but even if Section 2054 were unconstitutional in that one application, this does not "substantially outweigh" its constitutional applications to prevent individuals with no degrees at all, or degrees unrelated to healthcare, from claiming to be "doctors."[7]  (See DMSJ at 14.)  Defendants also assert that Section 2054 is a legitimate regulation of commercial speech.  (See id. at 14-24.)

In general, "a plaintiff cannot succeed on a facial challenge unless he establishes that no set of circumstances exists under which the law would be valid, or he shows that the law lacks a plainly legitimate sweep."  Moody v. NetChoice, LLC, 603 U.S. 707, 723 (2024) (citation modified).  "In First Amendment cases, however, [the Supreme Court] has lowered that very high bar," substituting "a less demanding though still rigorous standard."  Id.  "The question is whether a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  Id. (citation modified).

---

[7] Defendants contend that Plaintiffs do not defend and thus concede their facial challenge to Section 2054.  (See DMSJ Reply at 17 ("Plaintiffs do not dispute that they have not met their burden in bringing a facial challenge").)  The Court notes that Plaintiffs largely proffer facts and arguments to support their "as-applied" challenges to Section 2054.  (See, e.g., PMSJ at 30 ("It would be one thing if Defendants only enforced [S]ection 2054[] against those lacking a doctoral degree, or against those falsely claiming to possess an M.D. or D.O. degree, or against those with a doctoral degree unrelated to the general medical field. But Defendants have recently enforced [Section] 2054[] against at least one nurse practitioner who possesses a DNP and truthfully referred to herself as 'Dr.' without claiming to be a physician or hold a M.D. or D.O. degree."); PMSJ Reply.)  However, in the interest of justice, the Court construes the content- and speaker-based arguments set forth in Plaintiffs' PMSJ Reply as addressing and opposing Defendants' facial challenge arguments.  (See PMSJ Reply 7-9.)

"[A] First Amendment facial challenge has two parts[.]" <u>NetChoice, LLC v. Bonta</u>, 113
F.4th 1101, 1115 (9th Cir. 2024) ("<u>NetChoice II</u>"). "The first step in the proper facial analysis is
to assess the state laws' scope." <u>Moody</u>, 603 U.S. at 724. "What activities, by what actors, do
the laws prohibit or otherwise regulate?" <u>Id.</u> The second step "is to decide which of the laws'
applications violate the First Amendment, and to measure them against the rest." <u>Id.</u> at 725.
The party bringing the First Amendment facial challenge has the burden to show the full scope of
the law's coverage; to identify which of the law's applications are constitutionally permissible
and which are not; and, ultimately, to show that the law "prohibits a substantial amount of
protected speech relative to its plainly legitimate sweep." <u>Id.</u> at 744 (citation modified).

### 1. Scope of Section 2054

As noted above, Section 2054 prohibits anyone who does not possess a "valid, unrevoked,
and unsuspended certificate as a physician and surgeon" issued by the MBC from using the term
"doctor" or "Dr." in "any sign, business card, or letterhead, or, in an advertisement," and "in a
health care setting that would lead a reasonable patient to determine that person is a licensed
'M.D.' or 'D.O.'" Cal. Bus. & Prof. Code § 2054(a).

"When interpreting state laws, a federal court is bound by the decision of the highest
state court." <u>In re Kirkland</u>, 915 F.2d 1236, 1238 (9th Cir. 1990). When the highest court of a
state has not directly spoken on a matter of state law, a federal court sitting in diversity must
generally use its "own best judgment in predicting how the state's highest court would decide
the case." <u>Fiorito Bros., Inc. v. Fruehauf Corp.</u>, 747 F.2d 1309, 1314 (9th Cir. 1984). In making
this prediction, the federal court "must ascertain from all available data what the state law is and
apply it." <u>Estrella v. Brandt</u>, 682 F.2d 814, 817 (9th Cir. 1982). "An intermediate state appellate
court decision is a 'datum for ascertaining state law which is not to be disregarded by a federal
court unless it is convinced by other persuasive data that the highest court of the state would
decide otherwise.'" <u>Id.</u> (quoting <u>West v. Am. Tel. & Tel. Co.</u>, 311 U.S. 223, 237 (1940)); <u>T-
Mobile USA Inc. v. Selective Ins. Co. of Am.</u>, 908 F.3d 581, 586 (9th Cir. 2018); <u>Vestar Dev. II,
LLC v. Gen. Dynamics Corp.</u>, 249 F.3d 958, 960 (9th Cir. 2001) ("where there is no convincing
evidence that the state supreme court would decide differently, a federal court is obligated to
follow the decisions of the state's intermediate appellate courts") (citation modified).

The California Court of Appeals has found that the "purpose of [S]ection [2054] is to
protect the public"; "[a] person in California who holds himself out to the public as a licensed
physician . . . is clearly liable under [S]ection [2054] and the public is aggrieved by his
representing himself in the manner forbidden by the statute." <u>See</u> <u>Lawton v. Bd. of Med.
Examiners</u>, 143 Cal. App. 2d 256, 259 (1956). Moreover, with Section 2054, "[t]he [California]
Legislature intended every person engaged in professional activities properly to represent himself
in his true capacity by appropriate title." <u>See id.</u> The conclusions and findings of <u>Lawton</u>
concerning the legislative intent and purpose underlying Section 2054 constitute statutory
construction of state law by state courts. <u>See</u> <u>Long Beach Police Officers Assn. v. City of Long
Beach</u>, 46 Cal. 3d 736, 741 (1988) (determining legislative intent constitutes the fundamental goal
in construing a statute). The Court therefore finds that Section 2054 regulates the use of certain

professional titles associated with the medical field—i.e., "Dr." and "doctor"—in healthcare-related advertising and healthcare settings.  See Dare v. Bd. of Med. Examiners of State of California, 127 P.2d 977, 983 (Cal. Ct. App. 1942), vacated on other grounds Dare v. Bd. of Med. Examiners, 21 Cal. 2d 790, 136 P.2d 304 (1943) ("The [California] Legislature was justified in believing that the use of such title by others without descriptive designation would tend to indicate to the public that the user is a physician or surgeon.").

The Court further finds that Section 2054 regulates commercial speech.  Commercial speech represents "expression related solely to the economic interests of the speaker and its audience," Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557, 561 (1980), and "does no more than propose a commercial transaction."  Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 752 (1976); see also Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 554–55 (2001) (applying the Central Hudson analysis to tobacco advertising regulations).  In Bolger v. Youngs Drug Products Corp., 463 U.S. 60 (1983), the Supreme Court held that speech could properly be characterized as commercial when (1) the speech is admittedly advertising, (2) the speech references a specific product, and (3) the speaker has an economic motive for engaging in the speech.  Bolger, 463 U.S. at 66–67; see also Ass'n of Nat'l. Advertisers, Inc. v. Lungren, 44 F.3d 726, 728 (9th Cir. 1994) (applying the Bolger factors).  "These so-called Bolger factors are important guideposts, but they are not dispositive."  Ariix, LLC v. NutriSearch Corp., 985 F.3d 1107, 1116 (9th Cir. 2021) (citing and quoting Bolger, 463 U.S. at 67 n.14 ("Nor do we mean to suggest that each of the characteristics present in this case must necessarily be present in order for speech to be commercial.")); Dex Media West, Inc. v. City of Seattle, 696 F.3d 952, 958 (9th Cir. 2012).

Here, the speech regulated by Section 2054 constitutes advertisements for the purposes of the Bolger factors.  Notably, the first sentence of Section 2054 regulates the use of "Dr." or "doctor" in "any sign, business card, or letterhead, or, in an advertisement," and the Supreme Court has held that the use of professional titles and certifications in advertising, yellow-pages listings, business cards, and stationery is commercial speech.  Cal. Bus. & Prof. Code § 2054(a); Ibanez v. Fla. Dep't of Bus. & Pro. Regul., Bd. of Acct., 512 U.S. 136, 142 (1994) ("The Board correctly acknowledged that Ibanez' use of the CPA and CFP designations was 'commercial speech.'"); Am. Acad. of Pain Mgmt. v. Joseph, 353 F.3d 1099, 1106 (9th Cir. 2004) ("The statute thus identifies that the object of its regulation is 'advertising.' The advertising regulated relates to a specific product, medical services.").  However, Plaintiffs argue that "SB 1451 expanded the law's reach into noncommercial space by adding the phrase 'in a healthcare setting that would lead a reasonable *patient* to determine that person is a licensed 'M.D.' or 'D.O.'" (See PMSJ Reply at 11 (emphasis in original); Pl. SUF ¶¶ 4-5.)  For Plaintiffs, the patient is already seeking out care from Plaintiffs by the time they use "Dr." or "doctor" in a healthcare setting, rendering it noncommercial speech.  (See PMSJ at 22.)  Even if Plaintiffs' use of "doctor" and "Dr." is "commercial" speech in some instances, Plaintiffs assert that Section 2054 remains subject to strict scrutiny because it prohibits commercial speech inextricably intertwined with fully protected speech.  (See id. (citing Riley v. Nat'l Fed. of the Blind of N. Carolina, Inc., 487 U.S. 781, 795 (1988)).  The Court disagrees.

The Court recognizes that the use of "Dr." or "doctor" in a healthcare setting "is not []
the traditional form of an advertisement." Ariix, 985 F.3d at 1116. "A publication that is not in a
traditional advertising format but that still refers to a specific product can either be commercial
speech — or fully protected speech." Id.; Compare United States v. Wenger, 427 F.3d 840,
847–48 (10th Cir. 2005) (finding that a newsletter concerning investment advice is commercial
speech even though it "is concededly not a traditionally structured advertisement") with
Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n, 149 F.3d 679, 686 (7th
Cir. 1998) (citing cases that show that product reviews are generally not commercial speech).
Nonetheless, the Court finds that the "specific product" Plaintiffs seek to advertise when using
"Dr." or "doctor" in healthcare settings is the expertise, knowledge, and quality of services
these professional titles convey to patients and colleagues. See Brandwein v. California Bd. of
Osteopathic Examiners, 708 F.2d 1466, 1469 (9th Cir. 1983) ("the use of a degree is in effect a
representation to the public concerning the holders [sic] academic training and qualifications, one
which the public may rely on in selecting a physician," and as such, "it is closer to a form of
commercial speech than a philosophical statement").

"Finally, [Plaintiffs] ha[ve] an economic motive for engaging in this kind of speech, which
is to solicit [and retain] a patient base" and improve their professional brand. See Joseph, 353
F.3d at 1106. It is undisputed, for example, that Plaintiffs all desire to refer to themselves as
"Dr." and "doctor" to patients *and* in business cards, letterhead, websites, and advertisements.
(See Pl. Supp. SUF ¶¶ 44-46.) Plaintiff Palmer testified that she wants to use the title "doctor"
to get "credit" and "[a]cknowledgement" from "[e]verybody," including "[p]atients,"
"[o]ther healthcare providers," and "[a]ny living person." (See Choe Decl., Exhibit 9 at 75:5-
76:2.) Plaintiff Lewis testified that this case is part of her ongoing fight to seek greater practice
authority for nurse practitioners and how this authority could lead to income from patients going
to nurse practitioners instead of physicians. (See id., Exhibit 10 at 77:16–84:24.) Plaintiff
Hanson testified that he wants to use the title "doctor" to open an esthetic clinic because using
that title "will have an impact on [his] ability to find patients" such that he "would probably
have more patients ascribing to the services [he] provide[s.]" (See id., Exhibit 11 at 67:11–21.)
Plaintiff Hanson additionally believes that he will attract more patients if he can call himself "Dr.
Hanson" as opposed to not using the title "doctor," because "[i]f patients were given the
opportunity to pick between two clinics, one with Dr. Hanson and one with Mr. Hanson written
on it, most would gravitate to the former." (See Pl. Supp. SUF ¶ 47.) Further, as Defendants
aptly observe, "whether the patient is already seeking out care before a provider uses the title
'doctor' or 'Dr.' does not mean that the use of these titles is not commercial speech, retaining
existing clients is no less commercial than finding new ones." (See DMSJ at 16 n.8.) As such,
the Court finds that Plaintiffs have "adequate economic motivation" to use "Dr." or "doctor"
in healthcare settings because the "economic benefit"—e.g., increasing patient enrollment and
retention, and improving Plaintiffs' professional brand—is "the primary purpose" for using
these professional titles. (See PMSJ at 22 ("Plaintiffs have used, and intend to use, 'doctor' and
'Dr.' to accurately inform patients of their credentials and expertise.")); see also Ariix, 985 F.3d
at 1117 ("economic motivation is not limited simply to the expectation of a direct commercial
transaction with consumers"); id. ("Courts have found commercial speech even when it involves
indirect benefits, such as benefits to employee compensation, ***improvements to a brand's image***,

general exposure of a product, and protection of licensees' interests.") (citation modified) (emphasis added).

Sister Circuits have similarly held that the use of professional titles, regardless of setting, is commercial speech. See, e.g., Abramson v. Gonzalez, 949 F.2d 1567, 1574 (11th Cir. 1992) ("The restriction on the plaintiffs' ability to hold themselves out as psychologists clearly limits only commercial speech, for surely the sole purpose for holding oneself out as a psychologist is to gain commercial advantages. Even if the plaintiffs wish to hold themselves out as psychologists at cocktail parties or over private dinners, such expression is 'related solely to the economic interests of the speaker and its audience.'") (citing and quoting Central Hudson, 447 U.S. at 561); Roberts v. Farrell, 630 F. Supp. 2d 242, 243 (D. Conn. 2009) (finding that a Connecticut law's regulation of the use of professional titles "impermissibly restricted [] commercial speech"); Accountant's Soc'y of Va. v. Bowman, 860 F.2d 602, 605 (4th Cir. 1988) ("We agree with the district court that the words 'public accountant' and 'PA' are business or trade labels, analogous to advertising. . . these words are commercial speech."); Gonzalez-Colon v. Estado Libre Asociado de P.R., 2018 WL 3339688, at *4 (D.P.R. May 16, 2018), report and recommendation adopted, 2018 WL 3339688 (D.P.R. July 6, 2018) ("Because a title is merely shorthand for a description of a person's work, it is only logical that a long-form description would be commercial speech in the same way that a title is commercial speech.").

### 2. Applications of Section 2054

The second step to a First Amendment facial challenge "is to decide which of the laws' applications violate the First Amendment, and to measure them against the rest." Moody, 603 U.S. at 725. As discussed further below, the Court finds that Plaintiffs' facial challenge fails because (1) Section 2054 regulates misleading speech and therefore the First Amendment is not implicated and (2) even if the speech is not misleading, Section 2054 is a legitimate regulation of commercial speech.

## B. As-Applied Challenge to Section 2054

An as-applied challenge contends that the law is unconstitutional as applied to the litigant's particular speech activity, even though the law may be capable of valid application to others. See Foti v. City of Menlo Park, 146 F.3d 629, 635 (9th Cir. 1998), as amended on denial of reh'g (July 29, 1998).

"[C]ommercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values," and is subject to "modes of regulation that might be impermissible in the realm of noncommercial expression." Bd. of Trs. of State Univ. of New York v. Fox, 492 U.S. 469, 477 (1989) (citing and quoting Ohralik v. Ohio State Bar Assn., 436 U.S. 447, 456 (1978)); Lone Star Sec. & Video, Inc. v. City of Los Angeles, 827 F.3d 1192, 1198 n.3 (9th Cir. 2016) ("[A]lthough laws that restrict only commercial speech are content based, such restrictions need only withstand intermediate scrutiny.") (citing Reed, 576 U.S. 155 and Central Hudson, 447 U.S. 557).

Under Central Hudson, the Court must examine the following factors in determining whether Section 2054 violates Plaintiffs' constitutional right to freedom of expression: (1) whether Plaintiffs' expression is protected by the First Amendment because it is commercial speech that concerns lawful activity and is not misleading; (2) whether the asserted government interest in regulating the protected speech is substantial; (3) whether the regulation directly advances the governmental interest asserted; and (4) whether the regulation is not more extensive than necessary to serve that interest. See 447 U.S. at 563-66; Desert Outdoor Advertising, Inc. v. City of Moreno Valley, 103 F.3d 814, 819 (9th Cir. 1996). Defendants bear the burden to justify the challenged speech restriction. See Edenfield v. Fane, 507 U.S. 761, 770 (1993). Provided Plaintiffs' speech is protected by the First Amendment, they will prevail if Defendants fail to establish any one of the remaining Central Hudson factors.

Plaintiffs assert that it is not misleading to refer to themselves as a "Dr." or "doctor" even in a healthcare setting, and if the Court assumes that California has a substantial interest in regulating the use of "Dr." or "doctor," Section 2054 (1) does not directly advance that interest and (2) regulates more extensively than necessary. (See PMSJ at 24-31.) The Court addresses these arguments in turn.

### 1. Misleading Speech

The first inquiry is whether the speech is unlawful or misleading. See Joseph, 353 F.3d at 1106.[8] If it is either, then the commercial speech is not protected at all by the First Amendment. See id. In refining the commercial speech doctrine, the Supreme Court has distinguished between "inherently misleading" speech and "potentially misleading" speech. See In re R.M.J., 455 U.S. 191, 202–03 (1982).

When "advertising is inherently likely to deceive or where the record indicates that a particular form or method of advertising has in fact been deceptive," the advertising enjoys no First Amendment protection. See id. The government may ban this type of commercial speech entirely without satisfying the remaining three Central Hudson factors. Id. However, if the speech is only "potentially misleading," in other words, "if the information also may be presented in a way that is not deceptive," the speech regulation must satisfy the remaining three factors specified in Central Hudson. Id. at 203.

Plaintiffs contend that "[j]ust as it is truthful for other non-physicians and surgeons like dentists, pharmacists, and psychologists holding doctorate-level degrees in their relevant professions to refer to themselves as 'doctor,' so is it truthful for nurse practitioners with a DNP

---

[8] It is undisputed that Plaintiffs lawfully practice as nurse practitioners, possess doctorates in nursing practice, and do not seek to practice beyond their scope of practice. (See Pl. SUF ¶¶ 7, 19, 21, 31, 37, 54.) As such, because Section 2054—as applied to Plaintiffs—does not regulate speech that is promoting unlawful activity, the Court only considers whether Plaintiffs' desired use of "Dr." or "doctor" in advertising materials and healthcare settings is inherently misleading.

---

**CIVIL MINUTES—GENERAL**    Initials of Deputy Clerk MG

to do so." (See PMSJ at 25.) For Plaintiffs, the truthful use of professional titles is not misleading, particularly because "doctor" and "Dr." are not understood by healthcare providers and the public to only mean a physician or surgeon. (See id. at 26-28.)

Here, "the record indicates that [Plaintiffs'] particular form or method of advertising has in fact been deceptive," and thus, the speech enjoys no First Amendment protection. See R.M.J., 455 U.S. at 202–03. It is undisputed that Plaintiffs either used "Dr." or "doctor" in advertising materials and/or healthcare settings prior to learning about the legal actions against Sarah Erny. (See, e.g., Pl. SUF ¶¶ 14-16 (Plaintiff Palmer wore a clinician's jacket embroidered with "Dr. J. Palmer, FNP-C," introduced herself to patients as "I'm Dr. Jacqueline Palmer. I'm a nurse practitioner," and signed her name on official clinic documents using the title "Dr." and "FNP" as a post-nominal); id. ¶¶ 32-33, 74, 76, 78 (Plaintiff Lewis had business cards and an office door sign/nameplate reading "Dr. Heather Lewis, FNP-C, DNP" and initially referred to herself as "Dr. Heather Lewis, FNP-C, DNP" on social media); id. ¶¶ 82-83 (Plaintiff Hanson refrained from using the title "Dr." or "doctor" after learning about Sarah Erny and owns a desk nameplate that reads "Dr. Rodolfo Hanson, DNP, MSN, MASE, BSPT, RN, FNP-C, PHN"); Pl. Supp. SUF ¶¶ 48-50 (Plaintiff Palmer has used the title "Dr." with the letters FNP and FNP-C after her name; Plaintiff Lewis has used the title "Dr." with the letters FNP-C and DNP after her name; Plaintiff Hanson has used the title "Dr." with the letters DNP, MSN, MASE, BSPT, RN, FNP-C, and PHN after his name).) Although the parties dispute whether Plaintiff Lewis's patients ever mistook her for a doctor, it is also undisputed that patients assumed Plaintiff Palmer was a medical doctor and that Plaintiff Hanson makes it a point to explain to patients that he is not a physician when they call him "Dr." (See Pl. Supp. SUF ¶ 14; Pl. SUF ¶ 53); cf Lewis Decl. ¶¶ 6-7; Choe Decl., Exhibit 10 at 56:20-23.) As such, the record demonstrates that when certain Plaintiffs used "Dr." or "doctor" in the ways they now seek, some patients have been confused about their role and a Plaintiff has felt the need to explain to patients that they are not physicians—rendering the speech inherently misleading even though it communicates truthful information. See Recht v. Morrissey, 32 F.4th 398, 412 (4th Cir. 2022) ("[P]laintiffs overlook the fact that objectively truthful speech can still be misleading."); Nicopure Labs, LLC v. FDA, 944 F.3d 267, 287 (D.C. Cir. 2019) ("First Amendment test of regulation of potentially misleading commercial speech allows for contextual determination of accuracy based on consumers' understanding").

Plaintiffs so concede when they agree that the use of "Dr." or "doctor" in healthcare settings *without further clarification* generally refers to licensed physicians or surgeons. (See, e.g., Pl. Supp. SUF ¶¶ 17-18, 20-21, 23 (Palmer agrees that DNPs use of the title "doctor" without further clarification of their title makes it less clear for patients to know whether they are medical doctors or not; Palmer believes that DNPs using the title "doctor" in a healthcare context without clarifying that they are nurse practitioners would be "deception"; Lewis admits that in medical settings, "doctor" can refer to a licensed physician and surgeon; Hanson admits that in medical settings, "doctor" can refer to a licensed physician and surgeon; Hanson hypothetically agrees that if a healthcare provider introduces himself as "Dr. So-and-So" without further explanation, a patient might think the provider is a physician).) Although the Court agrees with Plaintiffs that generally the "use of 'Dr.' by individuals with a doctorate . . . is

ubiquitous," the record confirms that, for some patients, the use of "Dr." or "doctor" in healthcare settings implies that the person is holding themselves out as a physician. (See PMSJ Reply at 14.) Accordingly, "[t]he assumption that substantial numbers of potential clients would be so misled is hardly a speculative one." See Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio, 471 U.S. 626, 652 (1985).

Also, the Ninth Circuit has held that when the "State of California has by statute given [] term[s] . . . a special and particular meaning," "[t]he use of that term in advertising by . . . individual[s] . . . who do not meet the statutory requirements for doing so, is misleading." See Joseph, 353 F.3d at 1108 (holding that physicians' use of the term "board certified" was inherently misleading where physicians did not meet statutory requirements for board certification). Here, California not only regulates the title "doctor," it regulates the licensing and practice of physicians and surgeons. See Cal. Bus. & Prof. Code §§ 2080 et seq.; (see also DMSJ at 7-9; DMSJ Reply at 5-9.) It is undisputed that Plaintiffs do not meet these statutory requirements, and thus their use of "Dr." or "doctor" is inherently misleading. (See Pl. Supp. SUF ¶¶ 1-9.)

But even if the Court found that Plaintiffs' use of "Dr." or "doctor" is only potentially misleading, it would not change the result in this case, as consideration of the remaining three Central Hudson factors confirms that California may legitimately restrict the use of "Dr." or "doctor" in advertising and healthcare settings.

### 2. Substantial Interest

Plaintiffs concede—and the Court agrees—that California has a substantial interest in "protecting consumers from those who falsely hold themselves out as licensed physicians but [who] have not been duly licensed." (See PMSJ at 29 ("Plaintiffs will assume that such an interest is 'substantial' for the purposes of this summary judgment motion."); PMSJ Reply at 16 ("Plaintiffs recognize that protecting patients could be a legitimate government interest . . .")); see also Lawton, 143 Cal. App. 2d at 260 ("the public are entitled to know the qualifications of those who indirectly or directly affect the public welfare as does the medical profession"); People v. Sapse, 104 Cal. App. 3d Supp. 1, 10 (1980) (a statute "which imposes restrictions upon persons who wish to imply in California that they are medical practitioners, relates to an important state interest hardly admits of argument. The health and perhaps the lives of California citizens may be at stake"); Fla. Bar v. Went For It, Inc., 515 U.S. 618, 625 (1995) ("States have a compelling interest in the practice of professions within their boundaries, and . . . as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions.") (citing and quoting Goldfarb v. Virginia State Bar, 421 U.S. 773, 792 (1975)); Joseph, 353 F.3d at 1108 ("There is no question that California has a substantial interest in protecting consumers from misleading advertising by medical professionals."); Nat'l Ass'n for Advancement of Psychoanalysis v. California Bd. of Psychology, 228 F.3d 1043, 1054 (9th Cir. 2000) ("It is properly within the state's police power to regulate and license professions, especially when public health concerns are affected.").

### 3.  Directly Advancing the Interest

The final two steps of the <u>Central Hudson</u> analysis "basically involve a consideration of the 'fit' between the legislature's ends and the means chosen to accomplish those ends."  <u>See</u> <u>San Francisco Apartment Ass'n v. City & Cnty. of San Francisco</u>, 881 F.3d 1169, 1177 (9th Cir. 2018) (citing <u>Rubin v. Coors Brewing Co.</u>, 514 U.S. 476, 486 (1995)).

Plaintiffs assert that "at least as applied to nurse practitioners with DNPs, [who truthfully refer to themselves as "Dr." or "doctor,"] [S]ection 2054[] does not directly advance Defendants' only stated interest because it does not prevent fraudulent misrepresentations." (<u>See</u> PMSJ at 30.)  For Plaintiffs, "Defendants have offered no evidence that Plaintiffs have misled patients or that other doctorate degree holders in California have caused confusion or harm to healthcare patients."  (<u>See</u> PMSJ Reply at 17.)

Once a court recognizes a State's interest in protecting the public, "the State must demonstrate that the challenged regulation advances the Government's interest in a direct and material way," which requires it to show "that the harms it recites are real and that its restrictions will in fact alleviate them to a material degree."  <u>See</u> <u>Went For It, Inc.</u>, 515 U.S. at 625–26 (citation modified); <u>see also</u> <u>Central Hudson</u>, 447 U.S. at 564.  A state could meet this burden by relying on empirical data, studies, or anecdotes (whether in-state or extra-jurisdictional) or by reference to history, consensus, and common sense.  <u>See</u> <u>Went For It, Inc.</u>, 515 U.S. at 628.

As discussed above, the Court finds that the "harms [California] recites are real" because the speech has caused some patient confusion.  (<u>See</u> Pl. Supp. SUF ¶ 14; Pl. SUF ¶ 53); <u>Went For It, Inc.</u>, 515 U.S. at 625–26.  Additionally, the Court finds that it is reasonable to infer that some consumers will assume that Plaintiffs are licensed physicians or surgeons if they use "Dr." or "doctor" in healthcare settings and in advertising materials promoting medical services even if Plaintiffs also identify themselves as DNPs.  (<u>See</u> Pl. Supp. SUF ¶ 22 (The American Medical Association's survey results that show that 39% of patients believe that a DNP is a physician is consistent with Palmer's understanding of whether patients think DNPs are physicians); <u>id.</u> ¶¶ 54-57 (Palmer has no understanding of whether patients know what the letters DNP mean; Lewis is not sure if she encountered the letters DNP or knew what they meant until after she was in her bachelor's program for nursing; Hanson did not encounter the letters DNP or knew what they meant until after he was in nursing school; Hanson believes that patients do not know what the letters DNP mean, unless he explains it to them); DMSJ at 3-6 (arguing that a common layperson's understanding of the title "doctor" refers to physicians or surgeons as evidenced by (1) various dictionaries defining the term as such, "first and foremost," and (2) California's regulation of the title "doctor" for over a century to comport with the common layperson's understanding of the title)); <u>see also</u> <u>Lawton</u>, 143 Cal. App. 2d at 260 (finding that use of "Dr." is a "false insignia when a [provider] attempts to tell the world he is licensed when in fact he is not"); <u>Dare</u>, 127 P.2d 977, 983 (1942) ("In common parlance the term 'doctor' is customarily used to refer to physicians and surgeons.").  Accordingly, the record and common sense support

the conclusion that Section 2054 directly advances California's substantial interest in protecting consumers from misleading advertising by medical professionals.

### 4. More Extensive than Necessary

Plaintiffs next contend that less restrictive alternatives to Section 2054 exist because the California Business and Professions Code already requires that they disclose and explain their license and credentials, and California's false advertising and unfair business practices laws already address concerns about patient deception. (See PMSJ at 24, 31 (citing Cal. Bus. & Prof. Code §§ 680, 2278, 2835, 17200, 17500).) Defendant Melby herself proposed a less restrictive alternative while SB 1451 was being considered—allow professionals holding terminal degrees to use the title "Dr." so long as they "also indicate their profession or specialty on their badge and in communication." (See id. at 31; Pl. SUF ¶ 6.)

However, "[i]n considering the restriction imposed on commercial speech, [courts] do not require that it be the least restrictive means available." See Joseph, 353 F.3d at 1111 (citing Went For It, Inc., 515 U.S. at 632). Rather, what is required is "a reasonable fit between the legislature's ends and the means chosen to accomplish those ends." Id. The fit need not be perfect nor the single best to achieve those ends, but one whose scope is narrowly tailored to achieve the legislative objective. Id.

Here, Section 2054 does not limit Plaintiffs' ability to describe themselves as DNPs or to otherwise accurately state their credentials. (See DMSJ Reply at 13.) Instead, like the regulation in Joseph, Section 2054 restricts the use of "Dr." or "doctor" to individuals who "meet the statutory qualifications" associated with these professional titles. See Joseph, 353 F.3d at 1111 ("The legislation at issue in this case does not restrict a physician or surgeon from advertising that he or she had special training or continuing education with a non-qualifying board. Instead, it restricts the use of the term 'board certified' to signify certification by boards that meet the statutory qualifications. In the situation of the Academy, a physician or surgeon can advertise his or her membership in the Academy or special education received, but simply cannot use the term 'board certified' or its equivalent."). Accordingly, the Court finds that the "California legislation, even if not the least restrictive restriction, is a reasonable fit between the legislature's ends and the means chosen to accomplish those ends." See id. ("The [Supreme] Court has generally said it is up to the legislature to choose between narrowly tailored means of regulating commercial speech.") (citing Bd. of Trs., 492 U.S. at 479).

## V. CONCLUSION

For the foregoing reasons, the Court **DENIES** the PMSJ, **GRANTS** the DMSJ, and **DISMISSES** the First Amended Complaint **WITH PREJUDICE** as against all Defendants. The Court **VACATES** the September 22, 2025 hearing and **DENIES-AS-MOOT** the parties' request to appear at the hearing remotely (Dkt. Nos. 80, 87). Judgment shall issue accordingly, and the Clerk of the Court is **DIRECTED** to close this case.

**IT IS SO ORDERED.**